IN THE COURT OF APPEALS OF IOWA
No. 16-0878
Filed October 26, 2016

**IN THE INTEREST OF B.L. and A.L.,**
**Minor Children,**

**STATE OF IOWA,**
　　　Appellant.
_____

　　　Appeal from the Iowa District Court for Polk County, Romonda D. Belcher, District Associate Judge.

　　　The State and guardian ad litem appeal from the juvenile court's permanency order returning physical custody of B.L. to father and A.L. to mother. **REVERSED AND REMANDED.**

　　　Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellant State.

　　　Nicole Garbis Nolan of the Youth Law Center, Des Moines, for appellant minor children.

　　　Mark D. Reed of Marberry Law Firm, P.C., Urbandale, for appellee mother.

　　　Bryan P. Webber of Carr & Wright, P.L.C., Des Moines, for appellee father.

　　　Karen Taylor of Taylor Law Offices, Des Moines, for mother of B.L.

　　　Considered by Danilson, C.J., and Mullins and Bower, JJ.

**DANILSON, Chief Judge.**

The State and the children's guardian ad litem (GAL) challenge the juvenile court's ruling following a contested permanency hearing that the children be placed in the parents' physical custody—B.L. with the father; and A.L. with the mother, any contact between father and A.L. to be professionally supervised. Upon our de novo review, we reverse and remand for further proceedings.

**I. Background Facts and Proceedings.**

The mother (Tabitha) and father (Cole) married in 2013. Tabitha has a child from a previous relationship, A.C., born in October 2009.[1] Cole also has a child from a previous relationship, B.L., born in June 2008.[2] Cole and B.L. have been involved previously with the Iowa Department of Human Services (DHS). Together, Tabitha and Cole have a child, A.L., born in July 2012.

In May 2015, DHS investigated allegations made by A.C. that Cole had inappropriate sexual contact with A.C. Cole admitted touching A.C.'s genitals for medicinal purposes[3] but denied sexual contact. A child abuse investigation founded the allegations of sexual contact. The children remained in Tabitha's care subject to a safety plan under which she had agreed with DHS not to discuss the allegations with A.C. and not to allow unsupervised contact between Cole and the children. Thereafter, Tabitha and Cole violated the safety plan. Tabitha did not believe A.C.'s allegations, asserting they were made at Ryan's

---

[1] A.C.'s father is Ryan. Ryan is married and he and his wife have two other children in their household.

[2] Sarah is the non-custodial mother of B.L. Sarah "has a drug history" and "her son [B.L] has twice been involved in juvenile court because of [Sarah's] drug abuse issues." Sarah tested positive for methamphetamine on June 9, 2015.

[3] A.C. has a history of reoccurring yeast infections.

urging. The children were removed from Tabitha's and Cole's custody on May 29, 2015; A.C. was placed in Ryan's care, while A.L. and B.L. were placed with maternal grandparents. However, it was later reported the maternal grandmother "was unable to handle [B.L.'s] behaviors for more than one hour when she is alone with him." And, on July 7, while the children were visiting the paternal grandparents, the maternal grandmother packed all the children's belongings and delivered them to the paternal grandparents, "indicating they were done" caring for the children. On July 21, a motion to modify placement was filed with the court. On July 30, the juvenile court placed B.L. and A.L. in the temporary legal custody of paternal grandparents under DHS supervision.

A contested child-in-need-of-assistance (CINA) hearing was held on August 17, September 24, October 2 and 16, and December 11, 2015. On December 11, the juvenile court entered an order finding Cole had sexually abused A.C. and that the three children were CINA. The court found A.C. and A.L. were CINA pursuant to section 232.2(6)(c)(2) (2015) (failure to exercise a reasonable degree of care in supervising the child) and (6)(d) (imminently likely to be sexually abused by the child's parent or custodian),[4] and B.L. was CINA pursuant to section 232.2(6)(c)(2). The court ordered A.C. remain in Ryan's custody; B.L. and A.L. were to remain in the paternal grandparents' care under

---

[4] The original CINA adjudication order stated A.L. and A.C. were CINA under section 232.2(6)(c)(2) and (6)(n). However, the juvenile court later filed a "Child in Need of Assistance Disposition Order Without Modification of Placement & Nunc Pro Tunc Adjudicatory Order," which specified A.L. and A.C. were CINA under "(c)(2)" and "(d)", not "(n)."

DHS supervision. No appeal was taken from the adjudication and dispositional orders.

On January 25, 2016, DHS submitted a report to the court in which it was noted B.L. was diagnosed with disruptive behavior disorder, was attending individual therapy, and was able to be rewarded for positive behavior at school. It also noted that A.C. was involved in individual therapy and doing well in kindergarten. DHS recommended B.L. and A.C. continue to attend individual therapy.

The report also stated:

> Tabitha and Cole completed an online parenting class. FSRP [Family Safety, Risk, and Permanency] has worked with Tabitha and Cole on appropriate consequences for their children. Tabitha continues to believe that her daughter was not honest and the content of the child abuse assessment is untrue. Cole continues to have no contact with [A.C.] due to the founded child protective report for sexual abuse.
> . . . .
> Cole and Tabitha are currently not in individual therapy due to insurance issues. Cole and Tabitha continue to believe that the content of the [abuse investigation report] is untrue and that [A.C.] is lying. Tabitha is working with her parent partner and identifies her as a support. Cole, Tabitha, Ryan and Sarah have employment, housing, and transportation.
> . . . .
> The permanency recommendation for [B.L.] and [A.L.] and [A.C.] is that they be reunified with their mother, Tabitha [L.] and for [B.L.] and [A.L.] also their father, Cole. . . . Cole and Tabitha need to attend individual therapy to address the sexual abuse allegations and how this impacts their relationship and ability to be a family. Cole, Tabitha and Ryan will need to continue to live a life of recovery. Cole will need to address his criminal charges and abide by his current probation requirements.[5]

---

[5] In June 2015, Cole had been charged with drag racing and eluding.

Cole and Tabitha were encouraged to "honestly participate in therapy and follow all recommendations," participate in FSRP services, refrain from criminal activity, and provide drug screens.

A February 2016 letter from B.L.'s therapist, Rachel Klobassa, recommended he remain in his grandparents' care and "have consistent stable housing with clear boundaries and expectations," continued therapy, and supervised visits with his mother.

On February 5, 2016, a dispositional hearing was held and, on February 8, the juvenile court found "[p]lacement outside the parental home is necessary as a return to the home is contrary to their welfare due to allegations of sexual abuse in the home, failure of the parents to follow a safety plan." The court's written disposition order noted, Cole "has founded child abuse assessment for sexual abuse involving his stepdaughter, [A.C.], and the mother has struggled with protective capacity." The juvenile court also noted additional services were being requested, including medical-insurance coverage assistance or referral for continued therapy for the mother, father, and children, as well as a family team meeting. Out-of-home placement continued. The permanency plan was amended to require Cole to have a sex-abuse assessment if he "is not actively engaged in individual therapy." A review hearing was scheduled for May.

A case plan report dated April 20, 2016, was submitted to the juvenile court by social worker Natasha Richman. Richman's report indicated Tabitha's last therapy session was December 31, 2015, due to loss of insurance. The report noted Tabitha reported she had a therapy intake session scheduled for April 28. Richman expressed concern that "it has taken so long for Tabitha to

reengage in therapy and that a restrictive release was signed making this report lack[ing in] viable information required for DHS and the Court to make important decisions regarding her ability to safe[l]y parent."

As concerning Cole, Richman's report stated:

> Cole was seeing Dave Greenwood at Counseling for Growth and Change.[6]  He missed appointments on 8/25/15 and 9/11/15. Cole informed Dave that he needed appointments before 7 am and after 7 pm and at this time, Cole stopped seeing Dave.  Cole then started seeing Patricia Yavitz[7] at Life Works.  This therapy service was stopped by Life Works because the agency believed that Cole needed a higher level of therapy th[a]n Ms. Yavitz could provide. Lifeworks recommended Dave Greenwood or Amy Lapham at Counseling for Growth and Change for future therapy services.  At the family team [meeting] on 4/22/16, Cole reported that he is attending therapy but chose not to disclose who he is seeing or which agency they are providing services through.  This is a concern because this worker cannot provide the court with an accurate therapy update on Cole . . . and once again lacks viable information required for DHS and the Court to make recommendations regarding Cole's ability to safe[l]y parent.
> . . . .
> **Threats of Maltreatment:**
> There is a founded child abuse assessment for sex abuse on Cole . . . in regards to [A.C.].  Cole and Tabitha did not follow the safety plan during the CPA assessment.  At this time there has been little progress made in the case as Tabitha and Cole continue to deny that [A.C.'s] statements regarding the abuse are credible and truthful.

An addendum to the case plan report was submitted to the court in which DHS recommended the permanency goal be changed to termination of parental rights due to the parents' lack of participation in requested services.  In the addendum Richman stated:

---

[6] Greenwood specializes in treating sexual offenders, whether they admit the abuse or not.  Cole attended four sessions with Greenburg during July and August of 2015. However, he then missed appointments at the end of August and the beginning of September before he stopped seeing Greenwood all together.

[7] Yavitz reported Cole's treatment plan consisted of managing anxiety and worry.

> The parents, Cole and Tabitha [L.], have not participated in therapy services in a meaningful way to address any of the safety concerns that brought this case to the attention of the Court. At this time the Department has no information to suggest that Cole has received adequate treatment to ensure future sexual abuse of children in his care and custody would not occur. Additionally, the Department has no information to suggest that Tabitha has developed the necessary skills to identify and prevent sexual abuse of her children. To this day Tabitha refuses to accept [A.C.'s] consistent and credible statement regarding the sexual abuse she endured by Cole. Tabitha continues to maintain a relationship on some level with Cole which creates safety concerns for [A.L.] and [B.L] due to Cole's unwillingness to address his sexual perpetration.
>
> Cole and Tabitha refused to sign releases to their therapeutic providers in order for the Department and the court to obtain information regarding their progress until court ordered on 5/3/2016. In the previous court's order dated 2/5/2016 it stated that the father, Cole [L.], will participate in sex abuse assessment if not actively engaged in therapy. To the Department's knowledge this has not occurred to date.

It was also noted that Cole had started the three-session intake process for therapy on April 19 with the next session to be held on May 10.

On May 11 and 19, 2016, the juvenile court held a permanency hearing. The State requested that the permanency recommendation be amended and the court direct it to file a petition to terminate parental rights and order all parents to continue to cooperate with services, keep DHS informed as to the services, cooperate with FSRP, and cooperate with mental health treatment.

Tabitha testified she lost her insurance and attempted to obtain pro bono counseling. She also stated she had attended an intake for continuing counseling on April 28 and had her first appointment set up with a therapist. She asked that she be allowed an additional six months to work toward reunification,

stating that termination would not be in A.L.'s best interest and B.L. "would be devastated."[8]

Tabitha also testified she did not believe Cole sexually abused A.C. but felt she could adequately protect her children because in therapy she was working on "being able to support [A.C.] in her belief of what happened and support all my children, knowing the risks, the signs and symptoms of sexual abuse, having a plan of what would I do if I had my kids back and I saw those signs." Tabitha testified she intended to maintain her relationship with Cole.

The court asked Tabitha, "[D]o you understand that your decision to remain with [Cole] could affect your ability to have your child, in this case, returned back to you?" She responded, "I do. But if I divorce him, I lose [B.L.] too, and I'm already losing [A.C.]. I don't want to lose two. I just want my family back. [B.L.'s] my son, as well, and if I divorce him, I have no holds over him because I'm a stepparent." After additional questions from counsel, the following occurred:

> THE COURT: I guess the Court has another question. What would your family look like if this court were to return [A.L.] to you and place [B.L] in your care, but order that [Cole] could not have contact with those children? What would your family look like? Could you follow that no contact order?
> THE WITNESS [Tabitha]: My family would be me and my two kids and I could follow the no contact order.
> THE COURT: Any contact that [Cole] would have with the children would have to be professionally supervised until he sufficiently dealt with the issues that brought this matter to the court to the satisfaction of this court.
> So the Court would indicate he couldn't have contact—he could not have any contact that was not professionally supervised. Is that something that you could follow?

---

[8] Tabitha testified B.L. had lived with her and Cole since the child was two and she had been involved with Cole during the prior juvenile court proceedings involving B.L.

THE WITNESS: Yes.

THE COURT: And do you currently live together now?

THE WITNESS: Yes. But if I had my kids back, he would be gone. He'd pack his stuff and leave.

THE COURT: And could you maintain your child, as well as [B.L.], in your care without his support and being there?

THE WITNESS: Yes.

Cole testified at the hearing as well. When asked whether he had consistently denied sexually abusing A.C., he stated, "I'm going to plead the Fifth." With respect to his intention to continue in a relationship with Tabitha, he testified,

> The relationship I would have with Tabitha and my children would be outlined in this Court's recommendation, and it would be followed.
>
> . . . .
>
> Q. My question is: Is it your intent to remain in a marital relationship with Tabitha with whatever parameters are required? A. If I could divorce Tabitha and know that [B.L.] was going to go to her and not be put in foster care or sent with Sarah, if I knew that he was going to be put with her and be safe, we would divorce.
>
> . . . .
>
> Q. Your intent is—is your intent to continue a romantic relationship with Tabitha regardless of whether or not you live in the home or are married or not married? A. If the kids came back to her?
>
> Q. Yes. A. No.
>
> Q. Well, you've known that was the choice that you needed to make for the past year; right? A. I've known that was a choice, but no one has really told me anything. I've been in limbo. If someone would give me an answer or lead me a certain way, let me know what's going to happen to my kids, I could make a decision. We would make a decision, and that decision would be best for our children.

He also stated that he would "be open to sex offender treatment and working on my issues if it will help me get my kids back."

B.L.'s therapist, Klobassa, testified she had been working with B.L. during three CINA cases involving B.L. off and on for about three years. She stated B.L.

met the criteria for several diagnoses but she chose the most benign for the current diagnoses—oppositional defiant disorder and intermittent explosive disorder. Klobassa stated B.L. had resided primarily with Tabitha and Cole and saw Tabitha as a mother figure. She said she would not be supportive of terminating the relationship between Tabitha and B.L. or Cole and B.L. so long as they addressed "whatever issues are necessary" and "some sort of accountability" session was held to deal with why B.L. was required to live with his grandfather. Klobassa also testified B.L. was "doing fine" in his current placement.

Klobassa testified further Cole and Tabitha were not supportive of B.L. seeing Klobassa and they had attempted to interfere with his therapy with her. Klobassa stated she had dealt previously with inappropriate discipline being used by Cole in the family home relating to B.L., and she was surprised that the type of punishment used—which she had reported as abuse—had been imposed by Tabitha and not Cole, as she had been told previously. She stated Cole and Tabitha had been "difficult" to work with on the discipline issue. Klobassa also testified she had *not* diagnosed B.L. with posttraumatic stress and was surprised Tabitha had testified to the contrary. She also expressed concern that Cole was not engaged in any significant treatment concerning his sexual offense.

Klobassa was asked:

> Given the fact that the concurrent plan for the children would be for their grandfather to adopt them and not be cut off from the family, if the things that you have been told were testified to today, do you believe that it is best for the children to remain with their grandfather as opposed to being returned to either Cole or Tabitha?

Her response was, "Yes."

Case worker Richman testified that she had been working with the family for about a year, since the child-abuse assessment had been completed. Richman stated that since January 2016, the parents' involvement with services had "tapered off." Releases of information had been revoked by Tabitha and Cole, and she had not spoken with either's therapist since December 2015 or January 2016. Richman noted the children had been left in Tabitha's care at the beginning of these CINA proceedings but were removed due to Tabitha's violation of the safety plan. She testified further:

> Q. What is your recommendation to the Court today? A. Unfortunately, termination due to lack of progress in therapy, specifically, for both parents.
> Q. Does the fact that the mother does not believe that her daughter was sexually abused, despite the offer of services, factor into your recommendation? A. It is definitely concerning, yes.
> Q. What are the parties' intent—do you know what the parties' intent is regarding their marriage? A. I do not know.
> Q. Are they currently residing together? A. As far as I know, yes.
> Q. And was there a period of time where they were not residing together? Or at least they told you they weren't? A. They told us that they weren't. I believe they told us that Cole was staying with a different relative.
> Q. And then subsequent to that, did they choose to move back in together? A. That's what I was informed at the last hearing.
> Q. Are there any factors, in terms of Cole or Tabitha, that you could recite that would lead you to believe that it's reasonably likely that the children could be returned to either of their care in six months? A. Unfortunately, no. I wish that there was.

Richman stated B.L. and A.L. were doing well in their current placement[9] and the grandparents had said they would be a permanent placement.

At the conclusion of the permanency hearing the court ruled from the bench and ordered B.L. returned to Cole's care and A.L. returned to Tabitha's

---

[9] Richman said B.L. was "more stable than he's been since I've ever observed him."

care. The court stated any contact between Cole and A.L. was to be "professionally supervised." The court found:

> Court recognizes that at the initial proceedings that the court had allowed the children to remain in the custody of the mother. The court made findings that the mother had—and the father had violated the safety plan, but the court finds that that occurred prior to the parents engaging in any significant services.
>
> In determining placement of these children, this court must determine what is the least restrictive option under the circumstances.
>
> Based on the evidence and testimony presented, this court makes the following findings of fact, in addition to what was just stated on the record:
>
> . . . .
>
> Reasonable efforts have been made to prevent or eliminate the need for removal. Those efforts include child protective assessment, safety plan, individual counseling for the father—for [Cole] and the mothers and [B.L.], Regional Child Protection evaluation, drug screens, medical and dental care for the children, relative placement, FSRP services, visitation, parent partner, post-removal conference, and prior DHS and child-in-need-of-assistance services.
>
> This court has inquired as to the sufficiency of services. No additional services are being requested at this time.
>
> . . . .
>
> This Court determines that the primary permanency goal for the children is reunification as termination of parental rights is not in the children's best interests due to the bond with the parents and the reasons thus stated on the record.
>
> . . . .
>
> [Cole and Tabitha], you both need to understand. While this court is returning [B.L.] to [Cole] and there are no supervision exceptions regarding [B.L.], there are regarding [A.L.].
>
> Court recognizes that may not be ideal for you and your family, but certainly based on the evidence and the testimony this Court has received, this Court makes a finding that [B.L.] can be returned to his father . . . , under the supervision of the Department of Human Services, but any contact with [A.L.], who is being returned to her mother, must be professionally supervised.
>
> . . . .
>
> Certainly, because we are at permanency, it has been almost a year that these children have been removed. And while you have engaged in services, albeit not consistently, the court does find there's been progress, both in the terms of the services you have participated in and certainly given the semi-supervised

contact and there not being any safety concerns or any adjudicatory harm concerns that were presented to this court on behalf of the FSRP, who have the most contact with you and observe you with your children.

You are going to have to figure out what that looks like for you in terms of [Cole] not having contact with [A.L.] unless it is professionally supervised. That is the order of this court. The court did question you both regarding that. Court questioned you both while you were both under oath with respect to that.

Court finds that, as I indicated, at the time the initial safety plan was put in place, you have not—you had not at that time engaged in the services that you have been engaged, and the court makes its ruling based on where we present—where you present yourselves today. This court is going to order that [Cole] follow the recommendations for therapy. So whatever that is [Cole] that's what you are ordered to do. This court—nor does this court believe the Department is in a position to specifically direct where you attend your therapy, but your therapy do[es] need to address the reasons for which this matter came before this court, which were the allegations of sex abuse.

So the court sees you saw Mr. Greenwood. He had expected for you to return. You saw a number of other people and dealt with some other issues. But in order for this court to be in a position to determine that there can be something less than professionally supervised visits with [A.L.], you need to fully engage in the recommended services to address the issues whereby the matter was brought before this court. The case permanency plan— the court is also ordering the parents consistently engage in individual therapy.

Counsel for the State asked, "Your Honor, is the court ordering the parents not to live together? Because they live together." The court responded, "The court stated its ruling very clearly on the record. Certainly, if [A.L.] is in the home and there's not someone professionally present to supervise [A.L.], then the father can't be in the home." A written order was filed on May 19 in which the court concluded "the primary permanency goal for the children is reunification, as termination of parental rights is not in the children's best interest due to bond with parents and reasons thus stated on the record."

The State and the GAL appeal. The supreme court granted the State's motion to stay the juvenile court's order pending the appeal, which appeal is before this court.

## II. Scope and Standard of Review.

We review CINA and termination-of-parental-rights proceedings de novo. *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014). This requires that we "review both the facts and the law, and we adjudicate rights anew." *Id.* (internal quotation marks omitted). "As always, our fundamental concern is the child's best interests." *Id.*

## III. Discussion.

Iowa Code section 232.103(3) states, "A change in the level of care for a child who is subject to a dispositional order for out-of-home placement requires modification of the dispositional order." Section 232.103(4) allows the court to modify or terminate a dispositional order and release the child if the court finds "[t]he purposes of the order have been accomplished and the child is no longer in need of supervision, care, or treatment" or if "[t]he purposes of the order have been sufficiently accomplished and the continuation of supervision, care, or treatment is unjustified or unwarranted." Iowa Code § 232.103(4)(a), (d).

Here, the juvenile court terminated a dispositional order and returned the children before the purposes of the order had been accomplished—and specified that DHS supervision and ongoing treatment were required. *See In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001) ("[A] juvenile court is authorized to terminate a dispositional order only if 'the purposes of the [dispositional] order have been

accomplished and the child is no longer in need of supervision, care, or treatment.'" (citation omitted)).

However, section 232.104(2) provides that after a permanency hearing, the court "shall do one of the following"—(a) return the child to the child's home pursuant to 232.102 (entitled "transfer of legal custody of child and placement"), (b) continue placement for six months,[10] (c) direct the county attorney or GAL to institute termination-of-parental-rights proceedings, or (d) pursuant to a finding that termination of parental rights is not in the child's best interest, enter an order transferring custody to another enumerated person. Additionally, "[a]ny permanency order may provide restrictions upon the contact between the child and the child's parent or parents, consistent with the best interest of the child." Iowa Code § 232.104(4).

Upon our de novo review, we cannot agree that the children should be returned to Cole and Tabitha at this time. We need not address if the court should have ordered the county attorney to file a termination petition.

B.L. has found some stability and is doing well placed with his paternal grandfather. He is in need of continued therapy and consistency. His therapist testified Cole and Tabitha have not been supportive of that therapy.

DHS, the State, and the GAL were all in agreement that the safety concerns in this case remained unchanged a year after removal. The

---

[10] Section 232.104(2)(b) states further: "An order entered under this paragraph [(2)(b)] shall enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period."

permanency plan required Cole to have a sex-abuse assessment if he "is not actively engaged in individual therapy." He has done neither.

Both Tabitha and Cole previously declared they would abide by a safety plan and then violated it on more than one occasion. *See In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) (noting that a parent's past performance is indicative of future care). The couple is married and lives together. Despite their statements to the juvenile court that Cole would move out if ordered to do so, the court did not make that order, instead stating the two were "going to have to figure out what that looks like for you." We are not confident that the manner in which the parents will "figure this out" will sufficiently ensure the children's safety. *See In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981) ("[T]he State, as parens patriae, has the duty to assure that every child within its borders receives proper care and treatment, [and] it must intercede when parents abdicate that responsibility."). Cole has also not adequately addressed the issue of sexual abuse that brought this family to juvenile proceedings. The efforts of both Tabitha and Cole in complying with the requirements of DHS and court orders have been less than stellar. More significantly, Tabitha and Cole have not progressed to unsupervised visitation with either child. We will not order the return of the children under these circumstances.

We therefore reverse and remand for further proceedings. Return of the children to Cole and Tabitha is not in the children's best interest. The juvenile court must consider whether a six-month extension is warranted under section 232.104(2)(b). If so, the court must "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination

that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). If not, the court shall direct the filing of a petition to terminate parental rights or enter an order under subsection (2)(d) transferring custody to another. *Id.* § 232.104(2)(d). The message to Tabitha and Cole is a simple one—they both must take positive steps to comply with the DHS and court orders or they may face termination of their parental rights at some time in the future.

**REVERSED AND REMANDED.**